J-S31043-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GARY GODDARD | : | |
| | : | |
| Appellant | : | No. 2509 EDA 2023 |

Appeal from the PCRA Order Entered September 15, 2023
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0004365-2018

BEFORE: BOWES, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY BECK, J.: **FILED JANUARY 09, 2025**

Gary Goddard ("Goddard") appeals from the order entered by the Bucks

County Court of Common Pleas dismissing his petition pursuant to the Post

Conviction Relief Act ("PCRA").[1] On appeal, Goddard raises several ineffective

assistance of counsel claims. Because we conclude that his claims either lack

merit or are waived, we affirm.

A prior panel of this Court summarized the factual history of this case

as follows:

> Goddard's convictions stem from his role in multiple
> shootings that occurred at a gathering hosted outside April
> Coleman's [("Coleman")] home, located at 914 Elmhurst Avenue,
> in Bristol, Pennsylvania, on May 4, 2018, which resulted in the
> deaths of Zyisean McDuffie [("McDuffie")] and Tommy Ballard
> [("Ballard")]. On that date, Coleman hosted a party for her two
> children, who planned to attend their high school prom later that

_____

[1] 42 Pa.C.S. §§ 9541-9546.

evening. Several family friends were present including Joseph Williams [("Williams")], Gary Goddard, Jr. [("Goddard, Jr.")], Tajon Skelton [("Skelton")], Rayshaun James [("James")], and Sincere McNeil [("McNeil")]. These individuals were all gathered around [Coleman]'s Chrysler Pacifica, which was parked on her front lawn area.

At one point, McDuffie arrived at the Coleman residence, approached the group at the Chrysler Pacifica, and shook hands only with Williams. Williams then asked why McDuffie did not acknowledge the others, at which point McDuffie stated that he "didn't mess with none of them" and called them all "bitch." N.T., 3/12/2019, at 190. At the end of the verbal confrontation, McDuffie left, stating he would return soon.

When McDuffie returned about forty-five minutes to an hour later, he arrived with Ballard, Jahmier Wilson (["Wilson"]), and Jackie Valentine [("Valentine")]; Williams and Wilson then walked away together to have a private conversation. Within the larger group, still standing around the Chrysler Pacifica, an argument ensued amongst Goddard, Jr., McNeil, McDuffie and Ballard. McDuffie punched Goddard, Jr., in the face, and within moments, Williams removed the firearm from his waistband and began firing it at Wilson, who was running away from him. N.T., 3/15/2019, at 110-14; N.T., 3/18/2019, at 170-73. Although Williams fired repeatedly at Wilson, Wilson was not injured, but McDuffie and Ballard were struck. Ballard collapsed in the front yard of 911 Elmhurst Avenue and McDuffie was struck but still standing in the driveway of 916 Elmhurst Avenue.

Goddard then appeared, walking down Weston Avenue, with his hand raised and wielding a firearm. N.T., 3/13/2019, at 281-84; N.T., 3/15/2019, at 120-22. Standing in front of 916 Elmhurst Avenue, Goddard fired in the direction of the homes, and then at McDuffie, whose legs gave out from under him after the shots were fired. N.T., 3/15/2019, at 122; N.T., 3/18/2019, at 67-68. [Coleman] observed Goddard discharge his weapon at her home, heard glass breaking, and then said to him, "Are you fucking kidding me[?]" N.T., 3/15/2019, at 123-24. Goddard looked at her, but did not reply. Goddard then stood over McDuffie, who was lying on the ground, and discharged his firearm, lodging a bullet in McDuffie's head just above the hairline. N.T., 3/13/19, at 288; N.T., 3/18/19, at 117-22, 226-29. [Goddard and Goddard, Jr. then fled the location.]

* * *

When police arrived at the scene, Officer Michael Sarciewicz first found Ballard, who was still able to talk and move, lying in the grass at 911 Elmhurst Avenue. A crowd then directed the officer to McDuffie, who was unresponsive, located in front of 916 Elmhurst Avenue. The officer observed bleeding and several gunshot wounds on McDuffie, and commenced cardiopulmonary resuscitation (CPR). McDuffie and Ballard were both transported to Frankford-Torresdale Hospital, where McDuffie was pronounced dead on arrival, and Ballard was pronounced dead shortly after arrival.

Doctor Zhonghue Hua conducted McDuffie's autopsy. McDuffie was nineteen years old and suffered five gunshot wounds, including one each to his forehead above the hairline, his left upper back, his right flank, his right kneecap, and a graze wound to his right upper chest. Doctor Hua determined the fatal injury was the gunshot wound to his right flank, which punctured his kidney. N.T., 3/11/2019, at 193-94. Intact bullets were removed from McDuffie's kneecap, head, and abdomen, and were turned over to investigators. Doctor Hua concluded McDuffie was still alive at the time he was shot in the head due to evidence of brain bleeding, that the cause of death was multiple gunshot wounds, and that the manner of death was homicide. *Id.* at 215.

Police additionally removed two bullets from 914 Elmhurst Avenue—one was lodged in the siding of the residence; the other entered a window, proceeded through the kitchen, through a box of cereal, and into the wall before striking a flue and falling onto the utility room floor. *See* N.T., 3/6/2019, at 212-23, 227. Eric Nelson, of the Montgomery County Detectives, conducted a forensic examination of all the recovered bullets. The bullet recovered from the utility room floor and the one recovered from McDuffie's skull were discharged from a .32 H&R revolver found by police in Goddard's apartment. The fatal bullet recovered from McDuffie's abdominal wall was shot from the .38 Rossi Special firearm, which was recovered from a grill behind 703 Winder Drive[, which is the location video footage of the scene showed Williams fled.] The other bullets recovered from McDuffie's right knee and the siding of 914 Elmhurst Avenue were not traced to a known firearm, but were revealed to have been fired from a

- 3 -

firearm similar to a .38 revolver or .9 mm pistol. *See* N.T., 3/13/2019, at 232-39.

\* \* \*

On May 6, 2018, the Commonwealth charged Goddard with various crimes relating to the shooting incident ….

On March 4, 2019, the court held a hearing prior to the commencement of trial to resolve outstanding pretrial matters. At that hearing, the court granted the Commonwealth's motion to consolidate Goddard's case with the two cases against [Williams].

A joint jury trial commenced on March 4, 2019, and concluded on March 22, 2019. Goddard testified in his own defense. *See* N.T., 3/19/2019, at 201-314; N.T., 3/20/2019, at 5-113.

Goddard testified that he was at his brother's residence on Weston Avenue, down the street from where the shooting occurred, when he heard the first shots. Upon hearing the shooting, Goddard decided to run to his vehicle to retrieve his firearm, and then proceeded to the location of where he heard the shots. On arriving at the scene, Goddard saw his son on the ground with blood all over him, with an unknown individual—later identified as McDuffie—on top of him. Goddard ordered McDuffie off Goddard, Jr., and shot McDuffie twice when he failed to comply. Goddard testified that he shot McDuffie when he was still on top of Goddard, Jr. N.T., 3/20/19, at 62. Goddard explained neither how the bullet entered the front of McDuffie's head if he was shot from behind, nor how a bullet fired from his weapon entered Coleman's home. *Id.* at 62-63, 103-04. … Goddard also clarified that he is a licensed gun owner and frequently went shooting at a local gun range. He also testified that at one point Goddard, Jr., took one of his weapons without permission, and Goddard promptly reported that incident to police. He testified further that, because of various incidents that occurred between his son and Wilson, as well as his observations of a verbal altercation that occurred during a basketball game, Goddard was concerned about possible violent retribution against Goddard, Jr. N.T., 3/19/2019, at 242-52.

*Commonwealth v. Goddard*, 2097 EDA 2019, 2020 WL 7692794 at **1-**3 (Pa. Super. Dec. 28, 2020) (non-precedential decision) (footnotes omitted, record citations modified).

Following trial, a jury convicted Goddard of criminal attempt (homicide), discharge of a firearm into an occupied structure, recklessly endangering another person ("REAP"), and possessing an instrument of crime ("PIC").[2]  On June 13, 2019, the trial court sentenced Goddard to nine to eighteen years in prison on his criminal attempt (homicide) conviction and a consecutive sentence of three-and-a-half to seven years for his discharge of a firearm into an occupied structure conviction with no additional penalty for his REAP and PIC convictions.

On December 28, 2020, this Court affirmed Goddard's judgment of sentence.  *See id.* at **10.  On August 24, 2021, our Supreme Court denied Goddard's petition for allowance of appeal.  *Commonwealth v. Goddard*, 261 A.3d 1034 (Pa. 2021).

On November 10, 2021, Goddard filed a pro se PCRA petition, his first, and the PCRA court subsequently appointed counsel.  On September 26, 2022, Goddard filed a counseled amended PCRA petition in which he raised several

---

[2]  The jury found Williams guilty of two counts of first-degree murder and one count each of criminal attempt (homicide), firearms not to be carried without a license, REAP, PIC, and tampering with or fabricating physical evidence. Williams received the mandatory sentence of life imprisonment without the possibility of parole.

- 5 -

claims alleging the ineffectiveness of his trial and appellate counsel. ***See***
Amended PCRA Petition, 9/26/2022. On July 24, 2023, the PCRA court issued
notice pursuant to Pennsylvania Rule of Criminal Procedure 907 of its intent
to dismiss Goddard's petition without a hearing, to which Goddard responded
on August 13, 2023. On September 15, 2023, the PCRA court dismissed
Goddard's petition.

Goddard timely appealed to this Court. Both the PCRA court and
Goddard have complied with Pennsylvania Rule of Appellate Procedure 1925.
Goddard presents the following issues for review:

1.  Did trial counsel ineffectively fail to move to preclude the
    introduction of [Goddard]'s legally owned weapons,
    ammunition, and other gun-related items, that bore no
    relevance to the charges on federal constitutional grounds,
    having moved to preclude only under Pa.R.E. 403; and did
    appellate counsel ineffectively fail to raise the evidentiary
    ruling on direct appeal?

2.  Did trial counsel ineffectively fail to request an instruction
    on attempt to commit voluntary manslaughter-heat of
    passion; and imperfect defense of others, when a conviction
    on either theory would have resulted in a lower guideline
    range?

3.  Did the PCRA court err in ruling that [Goddard] failed to
    meet the certification requirements of the PCRA?

Goddard's Brief at 1-2 (unnecessary capitalization omitted).

We begin by acknowledging our standard of review. "We review the
denial of PCRA relief by examining whether the PCRA court's conclusions are
supported by the record and free from legal error." ***Commonwealth v.***
***Johnson***, 289 A.3d 959, 979 (Pa. 2023). "[W]e defer to the factual findings

of the post-conviction court, which is tasked with hearing the evidence and assessing credibility. *Id.* Our standard of review of a PCRA court's legal conclusions, however, is de novo. *Id.*

In his first two issues, Goddard raises multiple claims of ineffective assistance of counsel as to both his trial counsel and his appellate counsel.

> It is well-settled that counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different.

*Commonwealth v. Reid*, 259 A.3d 395, 405 (Pa. 2021) (quotation marks and citation omitted). Importantly, a PCRA petitioner must address each of these three prongs on appeal, as the petitioner bears the burden of pleading that counsel provided ineffective assistance. *Id.* This Court, however, need not review claims of ineffective assistance of counsel in any particular order, as the law is clear that "[a] petitioner's failure to satisfy any prong of this test is fatal to the claim." *Id.*

Additionally, to obtain relief, a PCRA petitioner must prove that an "allegation of error has not been previously litigated or waived." 42 Pa.C.S § 9543(a)(3). A claim is previously litigated if "the highest court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2).

For his first issue, Goddard argues the trial counsel was ineffective in failing to successfully convince the trial court to exclude evidence that Goddard had a license to carry firearms and that he lawfully owned guns, ammunition, and other gun accessories that he did not use in the shooting at issue in this case. Goddard's Brief at 5-15, 19-23. Goddard contends that trial counsel should have argued that the admission of this evidence infringed his Second Amendment rights under the United States Constitution.[3] *Id.* at 5-15, 19-23. Goddard asserts that the trial court wrongly concluded that such evidence was relevant, and that trial counsel was ineffective for failing to argue that the admission of irrelevant evidence that also violated his Second Amendment rights was improper. *Id.*

At the outset, we observe that, contrary to Goddard's claim, trial counsel did not solely challenge the admissibility of Goddard's firearms license and his ownership of guns, ammunition, and firearm accessories that were unrelated to the shooting under Pennsylvania Rule of Evidence 403.[4] The record reflects that he raised this claim in his pretrial suppression motion, contending that

---

[3] The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

[4] Rule 403 states: "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

the evidence was of no probative value and would be unfairly prejudicial to Goddard.  Omnibus Pre-Trial Motion, 2/14/2019, ¶ IV.  The record further reflects, however, that at the beginning of trial, trial counsel also argued that the evidence of the other firearms Goddard owned was irrelevant because those guns did not match the profile of any weapon he used during the shooting.  **See** N.T., 3/5/2019, at 6; **see also** Pa.R.E. 401.[5]  Ultimately, the trial court denied both of Goddard's motions and ruled that this evidence was relevant and admissible under both Rules 401 and 403.  **See** N.T., 3/5/2019, at 16-18.

Goddard is now attempting to re-litigate the trial court's decision regarding the relevancy and admissibility of this evidence.  Goddard's Brief at 12-15.  This is not a proper argument on collateral review.  **See Commonwealth v. Spotz**, 18 A.3d 244, 270 (Pa. 2011) (stating that a claim of trial court error "is both waived and not cognizable under the PCRA because it could have been raised on direct appeal").

Goddard further argues that trial counsel was ineffective for failing to challenge the admissibility of evidence of his gun license and the unrelated guns and ammunition under the Second Amendment to the United States Constitution and Article I, Section 21 of the Pennsylvania Constitution.  **See**

_____

[5] Rule 401 states: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Pa.R.E. 403.

Goddard's Brief at 5-15, 19-23. Although he "acknowledge[s] that evidence that impinges on a constitutional right can be admitted at a criminal trial, if the evidence bears some relevance to the issues at the trial," he bases his constitutional claim on his argument that the evidence in question was irrelevant and thus improperly admitted on this additional basis as well. *Id.* at 22-23. Because the trial court had ruled that this evidence was relevant, however, the PCRA court was required to reject this claim as previously litigated. *See Commonwealth v. Hutchins*, 760 A.2d 50, 55 (Pa. Super. 2000) ("A PCRA petitioner cannot obtain PCRA review of previously litigated claims decided adversely to him in his direct appeal simply by presenting those claims again in a PCRA petition and setting forth new theories of relief in support thereof.").[6]

While the relevancy of the evidence at issue was previously litigated, Goddard's related claim that **appellate** counsel was ineffective for failing to challenge the trial court's ruling on direct appeal can be advanced on collateral review. *See Commonwealth v. Collins*, 888 A.2d 564, 573 (Pa. 2005)

_____

[6] We note that we make no decision as to whether the admission of the evidence of Goddard's firearms license and of the other firearms, ammunition, and gun accessories that he did not use in the shooting violated his Second Amendment rights, as it is not necessary to resolve this claim. Goddard nevertheless concedes, "evidence that impinges on a constitutional right can be admitted at a criminal trial, if the evidence bears some relevance to the issues at the trial." Goddard's Brief at 22. Thus, pursuant to Goddard's own legal theory, even if the admission of the evidence at issue infringed on his Second Amendment rights, it would still have to pass the test of relevancy to be admissible. *See id.* at 22-23.

- 10 -

(recognizing that we must consider and analyze an ineffective assistance of counsel claim as a "distinct legal ground" for PCRA review). Here, Goddard argues that appellate counsel was ineffective for failing to challenge the trial court's rulings that evidence of his firearms license and the unrelated guns and ammunition was admissible under Rules 403 and 401 of the Pennsylvania Rules of Evidence. Goddard's Brief at 15-19.

Goddard, however, fails entirely to make any argument in support of prejudice. Instead, his argument consists of a string of case citations, the majority of which are federal decisions that have no precedential value before this Court, that found counsel's performance deficient for failing to raise some unidentified evidentiary claim. *See id.* at 15-17. He makes no argument to support a finding that the result of his proceedings would have been different if direct appeal counsel had challenged the trial court's ruling on the admissibility of the identified evidence. Therefore, even assuming the issue had any arguable merit and that appellate counsel lacked a reasonable basis for failing to raise the claim on direct appeal, his failure to even assert that the result of his appeal would have been different, let alone provide an explanation in support thereof, causes his challenge to appellate counsel's effectiveness to fail.

Indeed, such a scenario is difficult to envision as there were multiple eyewitness accounts of Goddard's actions on the night in question, including eyewitnesses who testified that they observed Goddard fire his gun into homes

on the street where the shooting occurred and that they witnessed Goddard discharge his firearm multiple times into McDuffie's forehead after he was already lying on the ground wounded. N.T., 3/15/2019, at 122-24; N.T., 3/18/2019, at 67-68, 117-22, 226-29. Based on this testimony, even if the evidence in question was erroneously admitted, and direct appeal counsel's failure to raise it constituted ineffectiveness, it would be difficult to conceive of this error as being anything but harmless.[7] Goddard cannot disprove that the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *See Poplawski*, 130 A.3d at 716. As Goddard did not and cannot prove that there is a reasonable probability that the outcome of his appeal would have been

_____

[7] "An error is harmless if it could not have contributed to the verdict, or stated conversely, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction." *Commonwealth v. Poplawski*, 130 A.3d 697, 716 (Pa. 2015). Harmless error occurs where:

> (1) the error did not prejudice the defendant or the prejudice was de minimis;
>
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
>
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* (citation omitted).

- 12 -

different had appellate counsel raised this evidentiary claim on direct appeal, we conclude that the PCRA court did not err in denying this claim. ***See Reid***, 259 A.3d at 405.

For his second issue, Goddard argues that trial counsel was ineffective because he did not request that the jury be instructed on attempted voluntary manslaughter. Goddard's Brief at 23-26. Specifically, Goddard contends that trial counsel should have requested heat of passion and imperfect defense of others instructions to reduce his attempted murder conviction to attempted voluntary manslaughter. ***Id.***

The Pennsylvania Crimes Code defines voluntary manslaughter as follows:

> **(a) General rule.--**A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> > (1) the individual killed; or
> >
> > (2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.
>
> **(b) Unreasonable belief killing justifiable.--**A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S. § 2503(a)-(b).

Our Supreme Court has defined "passion" required under section 2503(a) as "[a]nger and terror provided they reach a degree of intensity sufficient to obscure temporarily the reason of the person affected. ... Passion ... means any of the emotions of the mind known as anger, rage, sudden resentment[,] or terror, rendering the mind incapable of cool reflection[.]" **Commonwealth v. Laich**, 777 A.3d 1057, 1061 (Pa. 2001). The relevant inquiry for a heat of passion such that it reduces the charge from first-degree murder to voluntary manslaughter is the defendant's state of mind was at the time of the murder—whether he was "uncontrollably compelled by passion" or whether "the victim had provoked [him] into such passion." **Commonwealth v. Hutchinson**, 25 A.3d 277, 315 (Pa. 2011). "[T]he passage of time between provocation and the 'passion' must be viewed as a cooling period, and killings will not be deemed to have occurred under the heat of passion where there was sufficient time for cooling between whatever provocation might have existed and the actual killings." **Commonwealth v. Mason**, 130 A.3d 601, 629 (Pa. 2015).

Thus, "[i]n order to successfully argue heat of passion, a defendant must prove: (1) provocation on the part of the victim; (2) that a reasonable [person] who was confronted with the provoking events would become 'impassioned to the extent that his mind was incapable of cool reflection;' and (3) that the defendant did not have sufficient cooling off time between the

- 14 -

provocation and the killing." *Id.* at 628. If any of these elements is missing, the heat of passion defense fails. *Id.*; *see also Hutchinson*, 25 A.3d at 315.

Regarding section 2503(b), or imperfect defense of others, this Court has explained:

> A defense of "imperfect self-defense" exists where the defendant actually, but unreasonably, believed that deadly force was necessary. However, all other principles of self-defense must still be met in order to establish this defense. The requirements of self-defense are statutory: "The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself [or another] against the use of unlawful force by such other person on the present occasion." If "the defender did not reasonably believe deadly force was necessary[,] he provoked the incident, or he could retreat with safety, then his use of deadly force in self-defense was not justifiable." A successful claim of imperfect self-defense reduces murder to voluntary manslaughter.

*Commonwealth v. Truong*, 36 A.3d 592, 599 (Pa. Super. 2012) (en banc) (quotation marks and citations omitted).

The certified record reflects that Goddard's theory of defense at trial was that he shot McDuffie in defense of his son, Goddard, Jr., as Goddard claimed that when he arrived at the scene, McDuffie was on top of his son and that his son had blood all over his face. N.T., 3/20/2019, at 59-62. Such a claim could arguably support the argument that seeing his son in physical danger caused Goddard to act in the heat of passion or under the mistaken belief that the use of force was necessary to protect his son from physical harm.

The record, however, completely belies Goddard's claims that he acted in the heat of passion or in the mistaken defense of his son. Eyewitness

testimony reveals that when Goddard arrived at the scene, he shot McDuffie, who Williams had already shot, and that McDuffie fell to the ground. N.T., 3/18/2019, at 67-68; N.T., 3/15/2019, at 122. Goddard then proceeded to stand over top of McDuffie, who was already mortally wounded and lying on the ground, shooting him in the forehead. N.T., 3/18/2019, at 117-22, 226-29. Based on the foregoing, the record does not support Goddard's claim that McDuffie provoked his action, but rather that he was acting in a cool and calculated manner with the intent to kill McDuffie. *See id.*; *see also Mason*, 130 A.3d at 628. The record likewise does not support Goddard's claim that he mistakenly acted in defense of his son, as Goddard's decision to stand over top of McDuffie and shoot him in the forehead as he lay dying on the ground completely dispels the notion that he was acting in defense of his son—there is no possibility that Goddard saw McDuffie as posing a threat of any kind at that time. *See Truong*, 36 A.3d at 599.

Because Goddard was unlikely to succeed in his request for these jury instructions, let alone successfully reduce his conviction to voluntary manslaughter if the jury received heat of passion or imperfect defense of others jury instructions, we conclude that trial counsel's decision not to request these instructions did not prejudice Goddard. Accordingly, his second issue fails.

Although confusing and muddled, Goddard's final issue appears to challenge the PCRA court's decision to dismiss his petition without a hearing.

*See* Goddard's Brief at 27-28. The PCRA court provided the following explanation regarding its decision:

> [Goddard] failed to comply with the procedural requirements set forth by the PCRA, resulting in the inadmissibility of any evidence he would seek to present. Pursuant to the Pennsylvania Rules of Criminal Procedure, any petition under the PCRA must include "a signed certification as to each intended witness, stating the witness's name, address, and date of birth, and the substance of the witness's testimony. Any documents material to the witness's testimony shall also be included in the petition." Pa.R.Crim.P. 902(A)(15). If a petitioner cannot obtain the signature of a witness, the petitioner must instead include a certification, signed by the petitioner or counsel, stating the witness's name, address, date of birth and substance of testimony. 42 Pa.C.S. § 9545(d)(1)(i)-(iii).
>
> The certification must also include any documents material to the witness's testimony and specify the basis of the petitioner's information regarding the witness and the petitioner's efforts to obtain the witness's signature. *Id.* Failure to substantially comply with these requirements renders the proposed witness's testimony inadmissible. *Id.* As discussed in this [c]ourt's 907 [n]otice, [Goddard] failed to comply with these requirements, and [he] does not appeal this finding. Therefore, [Goddard]'s failure to comply with the statutory requirements in his pleadings has resulted in the inadmissibility of any testimony he would seek to present.

PCRA Court Opinion, 11/14/2023, at 17-18.

On appeal, Goddard refutes the PCRA court's determination that he failed to comply with Rule 902(A)(15) and section 9545(d)(1)(i)-(iii). Goddard's Brief at 27-28. Our review of Goddard's 1925(b) statement, however, reveals that he did not raise this claim despite the PCRA court having made the determination regarding the witness certifications in its Rule 907 notice. *See* 1925(b) Statement, 10/16/2023; *see also* Rule 907 Notice,

7/24/2023, ¶¶ 25-26. Instead, Goddard argued in his 1925(b) statement that he was entitled to a hearing because he "presented facts which if proven would entitle him to relief." 1925(b) Statement, 10/16/2023, ¶ 2C. Goddard has therefore waived his claim relating to the witness certifications on appeal. **See Commonwealth v. Bonnett**, 239 A.3d 1096, 1106 (Pa. Super. 2020) ("[A]ny issue not raised in a Rule 1925(b) statement will be deemed waived for appellate review."); **see also** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement ... are waived.").

To the extent Goddard has preserved a claim that the PCRA court erred in dismissing his petition without a hearing based on the facts he alleged, we conclude that Goddard's claim is meritless. We have recognized:

> The PCRA court has discretion to dismiss a petition without a hearing when the court is satisfied there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings. To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing.

**Commonwealth v. Smith**, 244 A.3d 13, 16 (Pa. Super. 2020) (quotation marks and citation omitted).

Here, Goddard has failed to highlight any genuine issues of material fact that, if resolved in his favor, would entitle him to relief. **See** Goddard's Brief at 27-28. Moreover, as we have already determined that the other issues Goddard raised in this appeal are meritless, we cannot say the PCRA court

- 18 -

abused its discretion in dismissing his petition without a hearing. Accordingly, Goddard's final issue fails.

As we conclude that the PCRA court's decision is supported by the record, we affirm the order dismissing Goddard's PCRA petition.

Order affirmed.

Judge Bowes joins the memorandum.

Judge McLaughlin files a concurring memorandum.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/9/2025